Argued and submitted January 29, affirmed April 21, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*
*v.*
ROBERT LEWIS HENLEY,
aka Sonny Henley,
*Defendant-Appellant.*

Malheur County Circuit Court
09072338C; A170383

486 P3d 853

Defendant was convicted of first-degree sexual abuse, ORS 163.427, and attempted first-degree sodomy, ORS 163.405, for acts committed against his 11-year-old stepdaughter. On review, the Supreme Court held that a forensic interviewer's testimony regarding "grooming" of children for sexual abuse constituted scientific evidence under OEC 702, such that the trial court erred in not requiring the state to establish a scientific foundation for the evidence. On remand, the trial court determined that the evidence had a sufficient scientific foundation to be admissible under OEC 702, and it reentered defendant's convictions. Defendant appeals, challenging the admission of the grooming testimony under OEC 401 (relevance), OEC 403 (unfair prejudice), and OEC 702 (scientific validity). *Held*: Given the procedural history of this case, the trial court did not err in limiting the remand proceeding to addressing the scientific validity of the grooming evidence to determine its admissibility under OEC 702. Nor did the trial court err in determining that the state had proved its scientific validity.

Affirmed.

Gregory L. Baxter, Judge.

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

This case is before us for the second time. Defendant was convicted of first-degree sexual abuse and attempted first-degree sodomy. The victim was his 11-year-old step-daughter. On review of the first judgment of conviction, the Supreme Court held that a forensic interviewer's testimony regarding "grooming" of children for sexual abuse consti-tuted scientific evidence under OEC 702, such that the state was required to establish a scientific foundation for it. *State v. Henley*, 363 Or 284, 304, 422 P3d 217 (2018). Because the trial court had viewed the testimony as nonscientific, it failed to "determine whether sexual grooming evidence pos-sesses the requisite level of scientific validity and reliability for admissibility under OEC 702." *Id*. at 307. The Supreme Court declined to decide that issue in the first instance, as the trial court was "best suited for the development of the evidentiary record concerning admissibility." *Id*. at 306-07. The matter was therefore remanded to the trial court for further proceedings. *Id*. at 310.

On remand, the trial court held a *Brown/O'Key* hearing. *See State v. O'Key*, 321 Or 285, 899 P2d 663 (1995); *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). Based on the evidence admitted at that hearing, the trial court con-cluded that the concept of grooming to which the witness testified had "a sufficient level of scientific validity to qualify for admission at trial," such that it was properly admissible under OEC 702. Accordingly, the court reentered defendant's convictions for first-degree sexual abuse and attempted first-degree sodomy. Defendant appeals, again challenging the admission of the grooming testimony. For the following reasons, we affirm.

## SCOPE OF APPEAL

We must first address the scope of this second appeal. In his first appeal to us, defendant challenged the admission of the grooming testimony on multiple grounds. He argued that the trial court erred in admitting it because the witness was not qualified to testify about grooming, because the state had failed to lay a scientific foundation under OEC 702, because the testimony was not relevant under OEC 401, and because the testimony was unduly

prejudicial under OEC 403. *State v. Henley*, 281 Or App 825, 826, 386 P3d 126 (2016), *rev'd*, 363 Or 284, 422 P3d 217 (2018); *see also State v. Southard*, 347 Or 127, 133, 218 P3d 104 (2009) (recognizing that, to be admissible, scientific evidence must be relevant (OEC 401), it must possess sufficient indicia of scientific validity (OEC 702), and its probative value must not be substantially outweighed by any unfairly prejudicial effect (OEC 403)). We rejected each of those challenges, either on the merits or as unpreserved. *Henley*, 281 Or App at 831, 834.

Defendant sought Supreme Court review only on the OEC 702 issue. The question presented to the Supreme Court was whether the admitted testimony about grooming "constitute[d] scientific evidence and so require[d] a foundational showing under OEC 702."[1] That was the only issue that the court considered. *See Henley*, 363 Or at 286 ("In this criminal case arising out of allegations of child sexual abuse, the issue is whether the expert testimony that the trial court allowed about 'grooming' children for later sexual activity is 'scientific' evidence that requires a foundational showing of scientific validity under OEC 702."). The court ultimately agreed with defendant that the testimony was scientific in nature and therefore required a scientific foundation under OEC 702. *Id.* at 304. It reversed and remanded for the trial court to determine, after appropriate development of the record, whether the testimony possessed the requisite level of scientific validity for admissibility under OEC 702. *Id.* at 307, 310.

Consistent with the foregoing sequence of events, on remand, the trial court held a *Brown/O'Key* hearing to determine whether the grooming testimony admitted over defendant's objection was scientifically valid. Relying on evidence offered by the state, the trial court ruled that it was, concluding that "the concept of grooming possesses a sufficient minimum level of scientific validity to be admissible

---

[1] In his petition for review, defendant posed a second question that put a constitutional gloss on the OEC 702 issue—whether the admission of scientific evidence without adequate testing of its validity violates due process— but he did not pursue the due-process angle in his Supreme Court merits briefing.

as scientific evidence under OEC 702." The court then reentered defendant's convictions.

On appeal from the resulting judgment, defendant contends that the trial court erred in its OEC 702 ruling, an issue that we address shortly. However, that is not all. Defendant also seeks to revisit other challenges to the admission of the grooming testimony that we considered and rejected in his first appeal. Specifically, he argues that the testimony should have been excluded as lacking relevance under OEC 401 and as substantially more unfairly prejudicial than probative under OEC 403. We reject those arguments. In the first appeal, we already rejected defendant's claims of error regarding OEC 401 and OEC 403 as unpreserved, and the Supreme Court did not grant review on those issues, address them in its opinion, or include them in the scope of the remand. Had the trial court ruled correctly on defendant's trial objection in the first instance (back in 2009), its ruling would have been limited to OEC 702, because that was the objection made. If defendant believed that we erred in the first appeal in ruling that his claims of error under OEC 401 or OEC 403 were unpreserved, or if defendant believed that something about the particular posture of this case merited allowing him to raise new OEC 401 or OEC 403 issues on remand despite not having raised them in the original trial, then he should have raised those matters in the Supreme Court. He did not. Under the circumstances, we cannot say that the trial court erred in limiting the remand proceedings to OEC 702.[2] We similarly limit our consideration to the OEC 702 ruling.

## MERITS

Having determined the scope of this appeal, we turn to the merits. Defendant argues that the state failed to establish the scientific validity of the concept of grooming to which the witness testified and that the trial court therefore

---

[2] At the *Brown/O'Key* hearing, the state maintained that the only issue before the trial court on remand was the grooming evidence's scientific validity under OEC 702, whereas defendant argued that the Supreme Court's opinion left open the possibility of revisiting the OEC 401 and OEC 403 issues. The trial court implicitly agreed with the state regarding the scope of the remand, ruling only on the OEC 702 issue.

erred in ruling that the testimony was admissible under OEC 702. We review the admissibility of scientific evidence for errors of law. *State v. Branch*, 243 Or App 309, 314, 259 P3d 103, *rev den*, 351 Or 216 (2011).

Evidence perceived by jurors to be scientific "possesses an unusually high degree of persuasive power." *O'Key*, 321 Or at 291. The trial court's role is to ensure that the persuasive appeal of such evidence is legitimate. *Id*. Toward that end, when evidence is scientific in nature, the court must determine that the evidence is scientifically valid before admitting it. *See id*. at 292. In conducting that analysis, the court is to keep in mind the purpose for which the evidence is offered. *State v. Perry*, 347 Or 110, 122, 218 P3d 95 (2009); *O'Key*, 321 Or at 302, 307. Additionally, the focus of the inquiry must be on principles and methodology, not conclusions. *Id*. at 305. Weaknesses in a given scientific study or errors in an expert's analysis do not render scientific evidence invalid; that is, they go to the weight of the evidence, not whether the factfinder should be allowed to hear it in the first place. *Thoens v. Safeco Ins. Co. of Oregon*, 272 Or App 512, 537, 356 P3d 91 (2015).

The Supreme Court has identified various nonexclusive factors that may be relevant when assessing the scientific validity of evidence under OEC 702. In *Brown*, the court identified seven primary factors: (1) the technique's general acceptance in the field; (2) the expert's qualifications and stature; (3) the use which has been made of the technique; (4) the potential rate of error; (5) the existence of specialized literature; (6) the novelty of the invention; and (7) the extent to which the technique relies on the subjective interpretation of the expert. 297 Or at 417 & n 5. Then, in *O'Key*, the court adopted four additional factors from *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 112 S Ct 2786, 126 L Ed 2d 469 (1993)—the leading federal case on the validity of scientific evidence—some of which overlap with the *Brown* factors: (1) whether the theory or technique in question can be and has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error and the existence of operational standards controlling the technique's operation; and (4) the

degree of acceptance in the relevant scientific community. *O'Key*, 321 Or at 303-04.

The *Brown*/*O'Key* factors are nonexclusive, not every factor needs to be considered in every case, and no single factor is decisive. *See Southard*, 347 Or at 134; *Brown*, 297 Or at 417 & n 5. Ultimately, determining whether evidence is scientifically valid for purposes of OEC 702 is a flexible process aimed at ascertaining the scientific validity of the principles underlying the evidence. *O'Key*, 321 Or at 303. The Supreme Court has demonstrated that flexibility when faced with scientific evidence as to which of the *Brown*/*O'Key* factors do not naturally fit. For example, in *Perry*, 347 Or at 121, 123-26, the court addressed scientific evidence about the phenomenon of "delayed reporting" of child sexual abuse, relying on only the few factors that it considered germane to conclude that the evidence was scientifically valid. In *Marcum v. Adventist Health System/West*, 345 Or 237, 245-46, 193 P3d 1 (2008), the court declined to use the *Brown*/*O'Key* factors at all, explaining that they were not useful in evaluating the scientific basis for medical causation testimony, which differed in nature from a particular technique or method.

Turning to the facts of this case, during defendant's criminal trial, the state called Palfreyman, a forensic interviewer for CARES (Child at Risk Evaluation Services), to testify about her interview of the victim. During that testimony, the prosecutor asked Palfreyman if she had training regarding a concept called grooming, and she said yes. Defendant objected to Palfreyman's qualifications to testify about grooming and also objected to a lack of scientific validity. Outside the jury's presence, the prosecutor told the court that he expected Palfreyman to testify that she had learned through her training and experience to recognize certain behaviors that could be considered grooming; to give examples of those behaviors, such as buying things for a child, treating a child differently, or touching a child in a way that is not necessarily sexual to accustom the child to being touched; and to identify anything from her interview of the victim that might be considered grooming. Based on that description, the court overruled defendant's objection,

reasoning that the evidence was not scientific in nature and did not require a scientific foundation.[3]

Palfreyman proceeded to testify that activities that might be considered grooming would include spending time together, allowing a child to do things the child's parents do not allow (such as play video games or use alcohol), giving a child money, tickling, and massaging. She said that grooming is done to build trust and weaken a child's defenses. She pointed to defendant's massaging the victim down into her chest area when she wanted a neck massage as something that the victim had mentioned in her interview that could be considered grooming. On cross-examination, Palfreyman agreed that spending time with a child, reading to a child, or taking a child for ice cream is not necessarily grooming, stating, "It depends on your motives." She testified that, if the person is an outsider whose motive is to get into the child's circle of trust, "then that could be potential grooming." Palfreyman concluded her testimony about grooming by confirming that whether any given behavior is grooming is a matter of the person's intent and that she had never talked to defendant about his intent.

As previously discussed, on review, the Supreme Court held that Palfreyman's testimony was scientific in nature and therefore required a scientific foundation to be admissible under OEC 702. On remand, the state relied on seven academic papers to establish the scientific validity of the concept of grooming to which Palfreyman testified. Our task on appeal is to determine whether the trial court erred in ruling that that evidence sufficiently established a scientific foundation for the testimony.

Preliminarily, we disagree with defendant that, when the Supreme Court remanded to the trial court to assess the scientific validity of the concept of grooming to which Palfreyman testified—rather than deciding that issue

---

[3] Because of the procedural history of this case, the trial court did not recognize the scientific nature of Palfreyman's testimony and assess its scientific foundation until long after trial. However, as we understand it, fundamentally, the trial court's task on remand was to reconsider its ruling on defendant's OEC 702 objection. Therefore, we consider the ruling in the context that it *would* have been made at trial, had the trial court correctly recognized the evidence as scientific in nature.

itself in the first instance—the court was implying that the academic papers cited in the parties' Supreme Court briefing were inadequate as a matter of law to establish scientific validity. It is true that the Supreme Court declined the state's suggestion to take judicial notice of those papers and use them to affirm on the alternative basis that Palfreyman's testimony had a scientific foundation. *Henley*, 363 Or at 304-05. The court did so, however, because the parties had "not been given a full opportunity to adduce evidence" regarding scientific foundation and, relatedly, because the court was "uncertain" about the completeness of the record. *Id*. at 305-06. We do not read those statements to suggest that the Supreme Court viewed the cited papers as inadequate to establish scientific validity. We understand the court to have remanded based on process concerns, irrespective of the merits. Further, the fact that the parties eschewed the opportunity to develop a fuller record on remand—the state offered into evidence the same papers that it had discussed in the Supreme Court, and defendant offered no evidence— is neither here nor there. The point of the remand was to give both parties a full opportunity to develop the record on scientific validity. The parties did what they did with that opportunity, and we must now review the trial court's OEC 702 ruling on the record that was made.

In doing so, our task is somewhat complicated by the fact that the record is silent as to the specific purpose for which the trial court admitted the grooming evidence. Both parties acknowledge that the purpose for which evidence is offered is relevant in evaluating its scientific validity. *Perry*, 347 Or at 122 ("Before applying the multifactor test to the evidence in question, it is important to restate the purpose for which the scientific evidence was offered."). That is, the trial court necessarily evaluates whether the evidence is scientifically valid *for the purpose for which it is offered*, not all possible purposes. *O'Key*, 321 Or at 302 ("Simply put, the scientific evidence must be pertinent to the issue to which it is directed. 'Scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.'" (Quoting *Daubert*, 509 US at 591 (brackets in *O'Key* omitted).)). At trial, however, defendant never objected to the relevance of the grooming evidence—only to scientific validity

and to Palfreyman's qualifications—nor did he make an OEC 403 objection that would have forced discussion of the evidence's probative value. And, because the trial court viewed the evidence as nonscientific, it did not conduct an OEC 702 analysis at the time of admission. Due to that combination of circumstances, the state was never put in the position of having to articulate the specific purpose for which it was offering the grooming testimony, and, relatedly, the trial court never expressly stated the purpose for which it was allowing it. The only specific comment that the court made was that Palfreyman could *not* testify that, in interviewing the victim, she saw signs of grooming and therefore diagnosed the victim as having been sexually abused.

Defendant conflates Palfreyman's testimony—which is what the trial court allowed over defendant's OEC 702 objection—with the prosecutor's closing argument—to which the defendant did not object. As described by the Supreme Court, the prosecutor made improper use of Palfreyman's testimony in closing, such that any error in admitting the testimony was not harmless. *Henley*, 363 Or at 308-09. However, we decline defendant's invitation to retroactively extrapolate from the prosecutor's closing remarks the purpose for which the *trial court* admitted the evidence much earlier in the trial when defendant objected. Whereas the harmlessness of any error in admitting the grooming testimony requires a review of the entire record, determining whether the trial court erred in overruling an objection must be evaluated at the time that the objection was made. *State v. Prieto-Rubio*, 262 Or App 149, 155, 324 P3d 543 (2014), *aff'd*, 359 Or 16, 367 P3d 255 (2016).

The trial court cautioned as part of its OEC 702 ruling that Palfreyman could not diagnose the victim as having been groomed and therefore sexually abused. And, shortly after that ruling was made, Palfreyman herself acknowledged that behavior identified as possible grooming is meaningless without knowing the person's *intent*. Although the prosecutor later relied on improper logic in using Palfreyman's testimony in closing, *see Henley*, 363 Or at 308-09, it is hardly unprecedented for a party to use evidence in closing for a purpose other than that for which it

was permissibly admitted. *See Perry*, 347 Or at 118 (a defendant is responsible to object if the state uses evidence in a manner that exceeds the scope for which the trial court could permissibly admit it).

Here, on the record that exists, it is reasonable to infer that the trial court admitted Palfreyman's testimony about the general concept of grooming only to explain the potential significance of some of defendant's behavior— *cf. State v. Etzel*, 310 Or App 761, 771-73, 488 P3d 783 (2021); *State v. Swinney*, 269 Or App 548, 552-55, 345 P3d 509, *rev den*, 357 Or 743 (2015)—not to establish that defendant *had* groomed the victim and *therefore* had sexually abused her. That is consistent with what the trial court said when ruling and with how Palfreyman testified immediately after the court's ruling, even though the prosecutor later cited the evidence for an improper purpose in closing. It is also consistent with how we described the admission of the evidence in the first appeal in connection with discussing defendant's challenge to Palfreyman's qualifications. *See Henley*, 281 Or App at 831 (stating that her "testimony about grooming was helpful to assist the jury in understanding defendant's behavior leading up to the camping trip").

With that in mind, we consider whether the evidence admitted at the *Brown/O'Key* hearing on remand— consisting of seven academic papers—adequately established the scientific validity of the general concept of grooming to which Palfreyman testified.

Per his reply brief, defendant "does not contest" that "the behavioral science concept of grooming by offenders, including 'boundary testing,' is well established," nor does he contest "that the methodology used to identify that behavior—mostly interviewing—is a valid scientific technique." His argument on appeal rests, instead, on the premise that the trial court admitted Palfreyman's testimony for forensic purposes and that *that* use of grooming evidence is not scientifically valid.

We absolutely agree with defendant that the record created at the *Brown/O'Key* hearing would not establish the scientific validity of using the concept of grooming as forensic evidence, *e.g.*, to prove that someone engaged in sexual

abuse *because* they engaged in grooming-consistent behaviors. That is, if the trial court had admitted Palfreyman's testimony for the purpose of showing that defendant engaged in behaviors that could be grooming *and therefore* sexually abused the victim, we would conclude that the state failed to establish scientific validity. But, as already explained, we do not understand the trial court to have admitted the testimony for that purpose.

For the purpose for which we understand the testimony to have been admitted, we conclude that the trial court did not err in ruling that the general concept of grooming to which Palfreyman testified is scientifically valid. The lack of expert testimony and the relatively small record made at the *Brown/O'Key* hearing make it a closer question than it might otherwise be. *Cf. Perry*, 347 Or at 122-26 (relying on expert testimony in evaluating the scientific validity of evidence about delayed reporting of child sexual abuse). We also note that the state relies heavily on case studies, but that is essentially unavoidable in this context. *See id.* at 113-14 & n 3 (recognizing descriptive case-study methodology employed in researching the phenomenon of delayed reporting of child sexual abuse and noting that controlled studies in the field of child sexual abuse research would flagrantly violate medical ethics).

As in *Perry* and *Marcum*, the *Brown/O'Key* factors are not a great fit for the type of evidence at issue here, requiring a more flexible approach. The factors that we do consider relevant are similar to those on which the court relied in *Perry,* 347 Or at 123-26: general acceptance in the field, the existence of specialized literature, and indicia that Palfreyman's approach was not unduly novel or improperly subjective. Ultimately, however, we hark back to the "fundamental question of the scientific validity of the general propositions utilized by the expert," which is what underlies the various considerations and factors described in *Brown* and *O'Key. Marcum*, 345 Or at 245. Doing so, we agree with the state that the seven academic papers admitted at the *Brown/O'Key* hearing sufficiently established the scientific validity of the general concept of grooming to which Palfreyman testified. That is, the state adequately established that Palfreyman's testimony was not grounded in "bad science"

of the sort that requires exclusion under OEC 702. *Id.* at 244 (stating that, in performing the "vital role of gatekeeper" under OEC 702, the trial court is to screen "proffered scientific testimony to determine whether it is sufficiently valid, as a matter of science, to legitimately assist the trier of fact," and the court is to exclude "bad science" that would be confusing, misleading, erroneous, prejudicial, or useless (internal quotation marks omitted)).

In sum, the trial court did not err in ruling that Palfreyman's grooming testimony had a sufficient scientific foundation to be admissible under OEC 702 and, therefore, reentering defendant's convictions.

Affirmed.